# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0748-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.J.,

     Defendant-Appellant,

and

P.J., and S.H. a/k/a S.H.R.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.K., J.K.,
L.K., and S.K., minors.

_____

Submitted November 30, 2021 – Decided January 12, 2022

Before Judges Currier, DeAlmeida, and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket Number FG-04-0171-20.

Williams Law Group, attorneys for appellant (Victoria D. Miranda, of counsel and on the briefs; Alvin Eugene Richards, III, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor A.K. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.K. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors L.K. and S.K. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Damen J. Thiel, Designated Counsel, on the brief).

PER CURIAM

Defendant S.J. appeals from the October 27, 2020 judgment of guardianship terminating her parental rights to her children A.K., J.K., L.K., and

S.K.[1] Defendant contends the trial court erred in denying her motion to adjourn the trial in order to retain a new expert and in finding the New Jersey Division of Child Protection and Permanency (the Division) met its burden in proving the four prongs of N.J.S.A. 30:4C-15.1 by clear and convincing evidence. We affirm.

I.

Defendant is the mother of seven children. All of them are in the Division's custody but only four are the subject of this appeal – A.K. (born in 2010), J.K. (born in 2016), and twins, L.K. and S.K. (born March 5, 2019).[2]

The Division first became involved with defendant following a referral in 2005 regarding unsafe living conditions and allegations of domestic violence. Additional referrals occurred through the ensuing years and the Division offered services on each occasion.

In 2011, the Division received a referral alleging that the family's home was in deplorable condition and lacked heating, plumbing, a refrigerator, and had exposed wiring. Defendant was using buckets or going to a local church for

---

[1]  We use initials to protect the identities of the parties.  R. 1:38-3(d). Defendants P.J. and S.H. did not appeal the order terminating their parental rights.

[2]  M.K. was born in 2002 and R.K. was born in 2004.

the family's toileting needs. The Division assisted the family with motel expenses and referred them to social services. However, when defendant and her mother (Jane) could not arrange suitable living arrangements for the children, the Division removed M.K., R.K., and A.K. from defendant's care and placed them into foster care.

Thereafter, the Division referred defendant for a psychological evaluation to assist in the planning of services for defendant and her family. The psychologist concluded that defendant functioned "in the [e]xtremely [l]ow to [b]orderline [r]ange of intellectual ability." In addition, the psychologist stated that defendant "demonstrates some confusion as to normal and expected child development" and is "defensive or avoidant, oppositional regarding test-taking, or otherwise unwilling to endorse commonly endorsed items." The psychologist recommended defendant participate in a parenting group due to her "limited cognitive abilities," and opined it was "premature to allow the children to return to [defendant's] custody."

Although the Division provided defendant with therapy treatment, the services were unsuccessful because of her "limited cognitive ability." In late 2011, defendant underwent a psychiatric evaluation following which she was diagnosed with "borderline IQ." The psychiatrist concluded that defendant

A-0748-20

"could not safely parent without help and that Jane . . . was not considered capable of parenting . . . [due to her own] signs of delusional disorder."

The Division arranged for defendant to have individual counseling and additional psychological services. However, when she was discharged from treatment, her psychologist remained skeptical about defendant's ability to parent on her own. He also had concerns about defendant's "unrealistic thoughts" and the fact that defendant and her mother "did not take responsibility for any of the circumstances that led to the children's removal," "never sent . . . the children [to] or involved the children in outside or structured activities," and "discussed inappropriate things in front of the children."

Nevertheless, the Division returned M.K., R.K., and A.K. to defendant's custody in March 2012. After the case was closed in September 2012, there was little interaction with the Division for the next several years.

In 2017, the Division received numerous referrals regarding the uncleanliness of the children and allegations of drugs and weapons in the home. The Division was unable to locate the family to investigate the referrals. The case was ultimately closed in October 2017 because the allegations were not established.

A-0748-20

In December 2017, the Division again received referrals regarding defendant and her children. The allegations included: seven-year-old A.K. was still in diapers, inappropriate incidents occurring between M.K. and R.K., and there were multiple animals and litter boxes near the children's beds. After defendant and her mother refused to cooperate with the Division's investigations, the Division sought and was granted care and supervision of the children in February 2018.

In September 2018, the Division received a referral from A.K.'s school in which the reporting person was concerned that eight-year-old A.K. did not know her letters, how to spell her name, or how to hold a book. This was A.K.'s first year in school because defendant had previously homeschooled her. The school also disclosed that defendant and her mother told school officials that the Division stole and cloned A.K. while she was in foster care. Jane stated, "[A.K.'s] brain 'was sucked out,' and that she was ultimately cloned." She also informed the school that although Jane had been diagnosed with schizophrenia and prescribed medication, she did not take it because "the people were out to kill her using the medication."

Later that month, when a Division worker entered defendant's home for an announced visit, defendant told the worker that when A.K. was a baby, "the

6

Division stole [A.K.] and placed her with a resource parent . . . and . . . cloned [her]." Defendant further reported that the procedure occurred at a hospital and a Division worker was paid for selling A.K.'s brain cells. Defendant also told the worker that A.K. is afraid of her doctor because that doctor was "part of the conspiracy" to clone her. Defendant stated the Division did not clone her older children M.K. and R.K., "because they were too old." Then, defendant told the Division worker that when defendant was visiting A.K. as a baby while in Division placement, defendant saw that A.K. was "bleeding from the head, with bruises and an incision" and "had black and blue marks on her vagina that was plastered with diaper cream." Defendant said this observation further substantiated her claim that the Division and A.K.'s resource parents had "severely beaten" and "cloned" A.K.

Also during this visit, defendant told the Division worker that she sees A.K.'s clone in the neighborhood and has taken pictures of her. When the Division instructed defendant to stop taking pictures of minor children, defendant told the Division that R.K. secretly takes the pictures. The Division worker then spoke to M.K. and R.K. who confirmed that they also believe A.K. was cloned. Following this visit, the Division worker initiated a safety

7

protection plan.  When the plan failed, the Division removed R.K., M.K., A.K., and J.K. from defendant's custody.

Thereafter, the court granted the Division the custody, care, and supervision of defendant's four children and ordered defendant and her mother to undergo a psychological evaluation.  Defendant was permitted supervised visits with her children twice a week for two hours.  Defendant and her mother were instructed not to contact the children outside of the supervised visits.

Nevertheless, the Division received a report that defendant and her mother were "leering into the [children's] school playground."  Also, defendant's family friend attempted to remove R.K. and M.K. from school with an "affidavit of guardianship," and later attempted to file for custody of the children.  Due to these incidents, the Division moved M.K., R.K., and A.K. to a different school.

In October 2018, defendant underwent a psychological and parenting capacity evaluation.  The doctor concluded that defendant "functions in the [e]xtremely [l]ow to [b]orderline [r]ange of intellectual ability."  In assessing defendant's parenting abilities, the psychologist noted that defendant "demonstrate[d] some confusion as to normal and expected child development" and that she exhibited "a low level of empathy for children and lack of awareness of the differing roles of children and adults in a family."  The psychologist was

8

A-0748-20

concerned about defendant's "base of parenting knowledge and skills," and concluded that defendant's issues emanated from "her lack of knowledge and understanding about her children's disorders, her lack of parenting skills and knowledge, and her susceptibility to the influence of her mother Jane when her mother is clearly not mentally stable."

Although defendant completed parenting classes and individual therapy, she did not appear to understand the developmental needs of a child past infancy. The Division also offered defendant parent and child interactive therapy, but it was ultimately unsuccessful, as defendant was hostile and refused to continue with the sessions when her mother could not attend.

After defendant failed to attend the supervised visit with her children on March 7, 2019, the Division learned she was pregnant and had given birth to twins, L.K. and S.K., two days earlier. In an effort to prevent the Division from learning of her pregnancy, defendant had unsuccessfully attempted to schedule her c-section at a hospital in Philadelphia. On the day of the scheduled supervised visit, Jane appeared and told the children that defendant was having oral surgery.

When the Division met with defendant at the hospital after she had given birth, defendant was unable to provide information about the twins' father other

than his name was "Sam" and that she had met him on a dating site. Defendant also told the Division worker that she had a friend who was going to adopt the twins because defendant did not want them to go into foster care. Defendant reiterated that the Division was conspiring to sell her children and holding her other children "as prisoners." The Division removed the twins from defendant's custody on March 8, 2019.

In April 2019, the Division set up visitation between defendant and her children. During the April 11 visit, defendant alleged that L.K.'s foster parents had "beaten [him] up." She made this statement in front of her children, which caused them to become visibly upset and confused. During a June 2019 visitation, defendant and her mother repeatedly told the children that the Division was selling them and the twins.

In July 2019, the Division referred defendant for a parental capacity evaluation. Defendant was diagnosed with "delusional disorder," "[m]ild intellectual disability," "[p]attern of psychological abuse," "[e]ducational and medical neglect," [and] "[i]mpaired insight and judgement." The doctor also found evidence of risk factors that would "interfere with safe and effective parenting." She recommended medication and therapy to treat defendant's delusional disorder but cautioned that defendant would not benefit from

10

counseling or other parenting programs unless her delusional disorder was reduced with medication. The doctor opined that if defendant did not follow the recommendations, she should not be unified with her children.

Defendant's visits with her children resumed in September 2019. The staff reported that defendant and her mother ignored the staff, called them names, and often argued with them. Defendant continued to discuss her conspiracy theories and Jane told the Division workers "you are all against my daughter."

Based on the psychological and parenting capacity reports and defendant's conduct during the supervised visits, the Division recommended a partial psychiatric care program at Jefferson Behavioral Health. In an October 3, 2019 report, the psychiatrist concluded that defendant has "[d]elusional disorder[,] [p]ersecutory type," severe post-traumatic stress disorder, and a "[s]evere learning and intellectual disability."

Over the next nine months, defendant attended individual therapy sessions. She also requested a clinical evaluation for "her pending case" with the Division. The therapist concluded defendant had a preliminary diagnosis of "[a]djustment disorder with mixed anxiety and depressed mood."

In February 2020, defendant admitted herself to the Genesis Counseling Center. She attended virtual sessions and was discharged on May 1, 2020.

11

Defendant sought readmission on May 21 and was diagnosed with an "[u]nspecified [i]ntellectual [d]isability and [a]djustment [disorder] with [m]ixed [m]ood." However, the Center discharged defendant from its program after Jane impersonated defendant during the phone telehealth appointments, defendant threatened Genesis employees in emails, Jane berated the psychologist and told her she had watched the psychologist leave work and get picked up by her husband. Although the Division referred defendant to another agency, she declined to go.

Due to the COVID-19 pandemic, the Division stopped in-person visits between defendant and her children, instead offering virtual visits over Zoom. However, the visits with the twins were delayed until May 2020 because defendant was harassing their resource parents.

Once in-person visits resumed in July 2020, defendant refused to attend, and the Division suspected she was pregnant. The Division's suspicions were confirmed, and the Division was granted custody of defendant's seventh child when she gave birth in October 2020. After defendant gave birth, she requested the resumption of in-person visits with her children.

Although the Division continued to assist defendant with medication and monitoring, it had a difficult time finding a provider to prescribe medicine

12

without an updated evaluation. Defendant refused to undergo any further psychological evaluations because the guardianship trial was to begin shortly, and defendant stated she would be prejudiced by further evaluations.

In August 2020, the trial judge conducted an in-camera interview with A.K. During the interview, A.K. stated she would like to live with defendant but could not explain why. When the judge asked her whether she would also be happy living with her resource parents, A.K. said yes.

II.

Following the filing of the guardianship complaint, the court conducted several case management conferences between April 22, 2020, and the start of trial in October 2020. At each of those conferences, defendant's counsel discussed the need for a defense expert report.

In April 2020, counsel stated he intended to obtain a report from defendant's current treating provider – Dr. Anthony Christinzie, Ph.D. At the next conference—on May 20—defendant's counsel informed the court the provider was a licensed professional therapist and had a Ph.D., so counsel was not sure if he was "an appropriate witness." The judge reminded counsel that the case was scheduled for trial in early September in an attempt to comply with

13

the statutory requirements regarding guardianship cases.[3]  See N.J.S.A. 30:4C-15.2 ("A final hearing for guardianship shall be held within three months from the date the petition is filed with the Family Part. . . .").

The judge stated: "[Y]ou're going to have to decide if you're calling Dr. Christinzie, if not, who you're using as an expert, what you're doing or otherwise."  Counsel responded: "Absolutely."  The judge continued, "Because obviously if this requires a psychiatric analysis, I would think that a licensed therapist is not the person to be rendering this determination."

Later during the conference, the judge inquired of defendant's counsel: "[I]f you're going to be obtaining your own expert, do you expect that you're going to be obtaining another expert?"  Counsel replied: "I mean, it sure looks that way, Judge, based upon examining Dr. Christinzie's CV, but I'll discuss it with my client subsequent to this hearing."  The judge reiterated that as soon as the courts re-opened, "the matter will proceed as timely as possible to trial."

At the next case management conference, held on June 16, 2020, defendant's counsel informed the court that Dr. Christinzie was not a psychiatrist and therefore he would not be issuing a report nor testifying as an expert witness.

---

[3]  As the courts were closed during the early months of the Covid-19 pandemic, the judge could not comply with the three-month statutory requirement.

A-0748-20

Counsel advised that defendant had gone to another facility and completed the intake process but a week later the facility contacted counsel and said they would not testify in court. Counsel stated he had two potential experts he intended to contact and understood the need to get an expert "firmly in place." The judge acknowledged it was unlikely the trial could proceed in early September due to the continued closure of the courts. She set a trial date of October 5, 2020, after obtaining the consent of all counsel.

During the July 7, 2020 case management conference, defendant's counsel informed the court he had retained an expert – Ange Puig, Ph.D. Counsel and the court were familiar with Dr. Puig and agreed that his credentials would not be an issue.

On August 22, 2020, defendant's counsel informed the court that Dr. Puig had examined defendant on two occasions in July and August and "was putting together an expert report." Counsel stated: "[o]bviously, he's prepared to testify and will testify." The following week, the court informed counsel that a courtroom was reserved for the October 6 trial.

During the September 10, 2020 case management conference, the court asked defendant's counsel about the status of Dr. Puig's report. Counsel replied: "The final evaluation [of defendant] is on [September]16. He's met with her I

15

think three times already. . . . He's well aware of the trial date. He's well aware of, you know, when—that the reports have to be done diligently." Counsel stated he had spoken to the expert just a few days earlier. He also advised Dr. Puig was only preparing a psychiatric assessment and not a bonding evaluation.

At a final conference before trial on September 23, 2020, defendant's counsel stated he was expecting a report from Dr. Puig "within the next day or two."

On October 1, 2020, the court held a conference after receiving an email from defendant's counsel stating he was having an issue with Dr. Puig. During the conference, defendant's counsel advised that Dr. Puig informed him on September 29 that the doctor "would not be available and would not be testifying, [and] that he [had not prepared] a report in this matter."

Defendant's counsel requested an adjournment stating defendant would be "severely prejudiced if not even given the opportunity to, to obtain another expert to testify on her behalf." The Division objected, pointing out the need for permanency for the children and the passage of seven months from the filing of the complaint. The Division's counsel stated: "This isn't an instance where [defendant] did not have an expert. She retained an expert, and he will not be testifying. So it's not [a] situation where she did not have the opportunity to

16

seek an expert on her behalf." The Law Guardian for A.K. advised he was "somewhat relying upon [defendant's] expert" and therefore joined in the adjournment request.

The court clarified with defendant's counsel that Dr. Puig's first interview of defendant was over two months earlier—on July 24—and the doctor was not now unavailable or requesting more time. Counsel agreed with the judge's statement and added: "the expert we retained is declining to testify."

After discussing the history of the litigation, including the lengthy placement of the children and the extensive discussions at multiple case management conferences regarding experts, the court denied defendant's request for an adjournment. The judge found that the "children are entitled to permanency," and "an end in sight," whether it be a termination of parental rights or a plan of reunification. The judge noted Dr. Puig had completed his evaluation but was declining to testify. She concluded it was not appropriate to grant an adjournment to allow defendant to "shop" for an expert and further delay the trial.

Trial began on October 6, 2020. J.K., L.K., and S.K.'s law guardians supported the Division's application to terminate defendant's rights. A.K.'s Law Guardian opposed termination.

17

The Division produced Alan Lee, Psy.D., and caseworker Lori Faye as its witnesses. Dr. Lee testified that his testing revealed defendant's IQ was 60, which is within the 0.4 percentile. Dr. Lee further testified that a person at this IQ range typically has difficulty with complex tasks, abstract thinking, and problem solving. Dr. Lee opined that defendant's "psychological and emotional functioning is less mature and less developed than most adults," resulting in defendant's difficulty with problem-solving and understanding the complex demands of child rearing.

Dr. Lee also observed that defendant perceives, understands, and interprets information in a way that is "not supported by reality." He diagnosed defendant with a "delusional disorder," "a rule out" for schizophrenia,[4] "intellectual disability disorder," "dependent personality traits," and a "reading or spelling learning disability." In conclusion, Dr. Lee testified that defendant should not be reunified with her four children now or in the foreseeable future. He also stated that defendant's prognosis for significant and lasting change was poor.

---

[4] A "rule out" means that it is possible that defendant has schizophrenia, although she did not meet the full criteria for the diagnosis.

Dr. Lee also conducted several bonding evaluations. As to the bonding evaluation between A.K. and defendant, the doctor stated A.K. showed some happiness and was not distressed or upset when meeting with defendant. However, he opined it was "an ambivalent and insecure attachment and relationship," and "not a significant and positive bond." Dr. Lee found there was "a low risk of [A.K.] suffering severe and enduring harm if her relationship with [defendant] is permanently ended."

Dr. Lee also conducted a bonding evaluation of A.K. and her resource parents. He noted that A.K. seemed happy and showed no distress. The doctor stated that A.K. had "formed a significant, positive, psychological attachment and bond with . . . each of the resource parents and . . . there's a significant risk for A.K. suffering severe and enduring harm if her relationship with the resource parents is permanently ended."

In discussing the other three children, Dr. Lee opined that J.K, L.K., and S.K. have an "ambivalent and insecure attachment" with defendant. In contrast, the doctor found J.K., L.K., and S.K. have a "positive psychological and emotional attachment or bond" with their respective resource parents.

Caseworker Faye testified regarding the Division's due diligence in pursuing the friends and relatives defendant identified for possible placements.

A-0748-20

The Division found that none of the options were appropriate. Faye also testified about the children's resource parents and current placements, stating that all the children's resource parents were committed to adoption. Overall, Faye described the children as doing well with their resource parents. Defendant did not testify at trial and did not present any witnesses.

On October 27, 2020, the court issued a comprehensive well-reasoned, one-hundred-page oral opinion finding the Division had sustained its burden of proof, by clear and convincing evidence, as to the four statutory prongs of N.J.S.A. 30:4C-15.1—the "best interests of the child" test. The court entered a judgment of guardianship terminating defendant's parental rights.

III.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Because of the family courts' special jurisdiction and expertise in family matters," we accord great deference to the Family Court judge's fact finding. N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citation omitted). Therefore, the trial court's findings "are binding on appeal when supported by adequate,

substantial, credible evidence."  Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

On appeal, defendant asserts the trial court made "improper findings of fact and conclusions of law based on the record"; she was deprived of the effective assistance of counsel; the trial court erred in finding the Division met its burden to terminate her parental rights under N.J.S.A. 30:4C-15.1; and the court abused its discretion in denying her adjournment request to obtain a new expert.

To strike the proper balance between a parent's constitutional rights and the child's need for permanency, courts apply the "best interests of the child" test codified in N.J.S.A. 30:4C-15.1(a).  This test authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following prongs are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and

21

the court has considered alternatives to termination of parental rights; and

(4) termination of parental rights will not do more harm than good.

Our Court has held that these four prongs are not "discrete and separate." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)). Rather, the prongs "relate to" and "overlap" with each other.

We affirm for the reasons stated in the judge's October 27, 2020 oral decision. Defendant's appellate arguments are without sufficient merit to warrant further discussion beyond the following comments. R. 2:11-3(e)(1)(E).

IV.

The court did not err in finding the Division met its burden under the four prongs. As to prong one, the Division presented evidence defendant harmed her children's safety, health, and development by: failing to provide proper housing; failing to take responsibility for the removal of the children; failing to adequately take care of her children and attend to their educational needs; continuing to state that the Division and resource parents had beaten and cloned the children; taking pictures of children defendant believed were A.K.'s clones;

enlisting her older children to take pictures of A.K.'s alleged clone; failing to attend visits with her children; and harassing L.K. and S.K.'s resource parents.

Defendant's delusional disorder poses actual and potential harm to her children and the trial judge properly found that prong one was satisfied because defendant suffers from and acts upon her delusions, and her distorted perceptions significantly impact her parenting ability. The court also considered Dr. Lee's testimony that defendant's delusions led to her "bizarre" and "unusual beliefs" about her children, as well as limited her insight and awareness.

As to prong two, the judge found defendant was unwilling to eliminate the harm to her children in failing to take any responsibility for the two removals and resulting litigation. Instead, defendant blamed others. The judge also found that defendant did not self-report any mental health issues during multiple psychological evaluations, and only portrayed herself in an "unrealistically positive light." This finding raised significant concerns about defendant's ability to safely parent. Furthermore, defendant had not come up with a plan to eliminate the harm to her children and to provide a safe and stable home for them if her parental rights were not terminated.

In turning to the third prong, the judge found the Division made "more than reasonable efforts to provide services" to defendant and her mother. Even

prior to the 2018 removal, the Division provided defendant with a multitude of services. And, as discussed above, the Division continued to offer and provide services to defendant after the children's removal including parenting classes, therapy programs, and medication management. Defendant did not attend or complete many of the offered programs and services and refused to take medication or treat her mental illnesses.

In addressing prong four, the trial judge found the record "clearly demonstrates" that each of the children bonded with their resource parents and that the resource parents met the children's needs. In contrast, defendant was not able to safely parent her children.

The court recognized that the children were entitled to permanency and stability, which could be achieved by terminating defendant's parental rights and permitting the children to remain with their resource families. The court also acknowledged A.K. might experience some distress if separated from defendant, but found any problems could be mitigated through therapy and her resource parents' support.

The trial judge thoroughly considered the overriding necessity for the children to have permanency and stability, the poor prognosis for defendant's improvement, the secure bonds between the children and their resource parents,

24

and the insecure bonds between the children and defendant. The court's findings underlying its determination to terminate defendant's parental rights were supported by the substantial credible evidence in the record.

We are unconvinced by defendant's argument that she did not receive effective assistance of counsel during this litigation. To the contrary, the court commended defendant's counsel for his "excellent advocacy," noting his extreme diligence and describing him as doing a "thorough job." Counsel attempted to produce a psychiatric expert, but his attempts were futile after several experts declined to testify following a review of records and meeting with defendant.

Defendant cannot demonstrate that counsel's performance was deficient or that any deficient performance prejudiced her defense. See Strickland v. Washington, 466 U.S. 668 (1984).

We turn then to the final issue before us: was the trial judge's denial of defendant's adjournment request an abuse of discretion? We conclude it was not.

A motion for an adjournment is addressed to the discretion of the trial court and will not lead to reversal unless the requesting party suffered a manifest wrong or injury. State v. Hayes, 205 N.J. 522, 537 (2011); Escobar-Barrera v.

A-0748-20

Kissin, 464 N.J. Super. 224, 233 (App. Div. 2020). We will only reverse a trial court's denial of a motion to adjourn where the decision is "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (citation omitted).

Furthermore, in guardianship cases, "[g]iven the impact of a trial delay or interruption on a child awaiting permanency, Family Part judges . . . must be mindful of the need for prompt determination of the difficult issues before them." R.L.M., 236 N.J. at 146-47. "[C]hildren have an essential and overriding interest in stability and permanency." In re Guardianship of J.C., 129 N.J. 1, 26 (1992). Therefore, "it is inimical to their welfare that their legal status remain unresolved." Ibid.

From the outset, following the filing of the guardianship complaint in March 2020, the court and defendant's counsel discussed the issue of a defense psychiatric expert. As is well documented in the conferences as described above, defendant's counsel approached several individuals and entities attempting to procure a psychiatric opinion he could present at trial to counter Dr. Lee's opinions. Counsel was aware trial would take place within six months.

26

In June, counsel informed the court that defendant had completed the intake process for the retention of a particular expert but was later apprised that the expert would not participate in the litigation. Counsel sought a new expert and told the court in early July he had successfully found a psychiatrist who would review documents, interview defendant, issue a report and testify at trial if desired. Trial was scheduled for October 6.

However, on October 1, defendant's counsel notified the court that Dr. Puig refused to issue a report or testify. Therefore, he sought to adjourn the trial.

At the time, defendant did not have a new expert who had agreed to proffer an opinion in the case. Defendant would have to find a willing expert – for the third time—and begin the process anew with providing documentation, producing defendant for interviews, and allowing time for the issuance of a report. There was no guarantee defendant could procure an expert to counter the opinions of Dr. Lee, opinions supported by numerous medical professionals who preceded him with similar diagnoses, recommendations, and evaluations. Defendant could not and did not state that any report she might have been able to produce would be favorable to her or change the judge's findings on the four statutory prongs.

27

A-0748-20

In addition, any continued delay disserved the children's interest in stability and permanency. The statute requires a court to hold a guardianship trial within three months after the petition is filed. Here, the court was asked to adjourn a trial that was already scheduled to begin four months beyond that deadline.

We are satisfied the judge did not abuse her discretion in denying the adjournment request. There was no manifest prejudice to defendant as the Division was still required to prove the four statutory prongs by clear and convincing evidence. And defendant was able to cross-examine the Division's witnesses and present evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0748-20